Good morning, Your Honors. Good morning, Mr. Guzman. May it please the Court, I am Francisco Guzman, appearing for Santos Moises Tejada Tejada, who is the petitioner before the Court. You might want to put that just down a touch. Thank you, sir. How about this? Perfect. Very well. I ask to reserve five minutes of my time. Thank you. As we are in this chamber, Moises Tejada Tejada has served and is incarcerated in a New Jersey correction facility for approximately 24 months. And the reason why he remains there is because the Bureau misapplied, misrepresented the immigration judge had at its disposal in order to rule in favor of Moises Tejada Tejada. Now, much has been said as whether or not this Court, honorable as it is, has the jurisdiction to hear as to whether or not a constitutional claim or a question of law exists for you to take review of this petition. And we say that you do. And here's how you do. The actual determination, the decision by the Bureau, constitutes an adverse credibility finding against Tejada Tejada because it failed to apply the correct burden and it failed to apply the correct standard. How is that an adverse credibility determination? Well, Judge, the Bureau took liberties with the facts. In fact, I actually, we actually say in our brief that they started cherry-picking certain facts and as a result, they went into the burden of exceptional. But cherry-picking is taken from the Wong case and Wong is, was a case where there was significant evidence in favor of the petitioner that was ignored by the BIA. It looks like in this case, there were, maybe you could say there was some sloppiness with regard to the BIA decision where they used the wrong, you know, they were looking at arrests as opposed to convictions. They were saying that he had been incarcerated numerous times, but it was only really once except for this particular immigration case, but the one time for the illusion of the police officers. Okay, that's not, not hoiled, but it doesn't look like they're cherry-picking like Wong. Judge, I'll use your term. They were sloppy. See, the immigration judge has the opportunity to see witnesses, they take testimony, they take proofs, and exactly in this case, Tejada Tejada through his counsel at the immigration level before the immigration judge actually did that. I think what you're saying, if I understand you correctly, is that this is a legal issue. It is a legal issue. It's a legal issue because this involves a standard of review. Absolutely. But you also mentioned adverse credibility findings, so maybe you can link your, your making a comment about adverse credibility finding with the standard of review that makes this a matter of law and gives us jurisdiction. That's what we, that's what I'd like to press upon the court this morning, and I say that because in its decision, it actually refers, the Bureau actually refers to the immigration judge's findings, and it says that it is credible. But then it seems to attack the immigration judge and its findings by trying to whittle down and trying to bring the circumstances that led Tejada Tejada before the immigration judge. Doesn't, doesn't this, you know, you've got a sympathetic case here, but don't we really end up with a re-weighing of, of the evidence, and haven't we said that, you know, even if the BIA improperly weighs this evidence, that there's nothing we can do about it? No, that's exactly what the Bureau did. They started to review the facts and circumstances. I understand. I think that this court, as a matter of law, can, can actually pinpoint to the actual claim itself. By the adverse finding of the Bureau, they've actually violated his constitutional right. But don't, don't we get, I mean, we could probably say that about every one of these cases where the BIA disagrees with the IJ, as good as the IJ may have, may have written its decision. I know that many... We, we, do we, we, you know, would transform all of these into matters of law. But in this case, what you have, Your Honors, is you have a legal permanent resident. He's been in this country more than 20 years, okay? He goes before the immigration judge, proves his case, okay? One could wonder why the issue of the cancellation was not brought up or raised on appeal before the Bureau, but nonetheless... Those are very sympathetic factors. I, and, and I think we started out by saying this is a very sympathetic case. I'm grateful. But, but you're talking about the standard of review. How did the BIA violate the standard of review that it should give the immigration judge? I'll use Judge Ambrose's terms. It was sloppy. It was sloppy. But, but... See, what happens, what happens is they want... They won't get you there. No, no, look. What happens is, Your Honor, they want to convince everyone, that's why they decided in its decision, that because Tejada had alluded or had committed a second degree crime in the state of New Jersey, as a result, that's a violent crime. And as, as such, all the factors that they now started reviewing and issuing its decision, all those factors now have to be placed against an exceptional and extreme hardship. And that's wrong. That's incorrect. They should have at least accepted, and they say that in their decision, accepted the facts as the immigration judge saw it, and then went into the actual burden itself. The BIA engaged in its own fact-finding, which I think you're suggesting is inappropriate. They misrepresented the facts here, not, not, not small little facts, but they actually just didn't consider the entire record below. The, the, the... But they also said, you know what, if we, if we get to the, if we get to the merits, we don't, we don't think this is one where we could possibly grant the, to, the waiver. Yes. And so, in effect, if you win a battle here, you, sounds like you're still going to end up losing the war. Am I, or is Tejada Tejada going to do that, Judge, when, if you return it back to them with the understanding, with the instruction that they at least take verbatim, or close to verbatim, or don't go below the actual facts that the immigration judge heard, accepted, took as proofs, then automatically it would appear that he would be entitled to that waiver. It was only imbalancing. I mean, the immigration judge weighs a number of factors. It took into account the high-speed chase. Oh, absolutely. But, and I'm glad that you mentioned that, Your Honor. There was no high-speed chase here. And you carefully review. I mean, you may be right. Here's the problem. He pled to second degree. And, I mean, I don't know how to get around that. He, you know, had his, I don't, I guess you weren't the counsel back then. I've tried to go to the roof of my building to scream about that, but I wasn't counsel back then. You know, his counsel would have said, there's no way in the world you're going to plead to second degree alluding.    You're stuck with that one. But I still think, and I'm grateful that you directed me that way, but I want to direct back to the issue about that there is a constitutional claim here. The fact that this decision is adverse to Tejada Tejada using that high standard of a second degree charge where it should not have used is a claim or a question of law itself. You're right. But a lot of people can come up here to the podium on behalf of every petitioner similarly situated because it's an adverse situation, but, you know, Tejada proved this case. But then what he has to show, let's assume that because of second degree, you need something that's an extreme hardship or there's some debate between the BIA. If it's a crime. If it's a crime. Yeah. And we respectfully disagree that it's not a crime under the exceptions here. But it is under the statute. I mean, that it involves, and we have at least Lipscomb and Reyes, two NPOs saying that it is a crime of violence. But what you, so under 212, you can still possibly win if you show the extreme hardship. Here's the problem. Yes, sir. That I have. You've got someone who was abused by a relative, a daughter, at age 11. Yes. She went for one year of counseling. She appeared to be much, or she claimed she did much better after that. She is, I believe today, a senior in high school. Yes, she is. And so, and the father, although he's given support, and not just financial support, but psychological support over the years, he still hasn't been there. Oh, no, he has, Your Honor, with all due respect. He was there every other day on the weekends, parties. No, no, I understand that, but the point is that at this point, she's going to be going off to college. What, to have him here in the United States, most cases like this that I've seen in my 12 and a half years, this doesn't rise to the level of extreme hardship. Judge. I mean, I've seen much worse where they've said, nope, can't do it. I know you have, but you know, today, in today's world, parents and children are entwined because of finances and the economic crisis and all that. I can continue on, however, my time is up. How about the financial support? Now, you did mention he's been in custody for two years. Remember, well, you know, he does it through his brother. As an officer of the court, I'm informing you of that, but remember what he proved at trial, paying directly to the child, to the mother, $100 a week at that time, it's a lot of money for an 11-year-old. So that he was giving support and it was helping that child. And you know what? He wasn't married to the mother of the child, but he was helping her as well. I'll return it to you, thank you. Ms. Heller. Thank you. May it please the court, Zoe Heller on behalf of the Attorney General. After a full and fair hearing and an appeal before the administrative body, the board here reversed the immigration judge and denied Mr. Tejada a discretionary waiver of admissibility for two reasons. One, he did not demonstrate extreme hardship to his daughter, and two, as a matter of discretion. I thought the board in this case seemed to go out on its own and make findings that were inconsistent with the findings that the IJ made. Especially concerning arrests that the board ascribed to the petitioner, and used that as the arrest in weighing whether there was extreme hardship. Well – Can you comment on that? I thought it was just inappropriate because there were no – there were arrests, but I thought in its own jurisprudence the BIA doesn't give a significant weight to arrests. Well Your Honor, on page three of the board's decision, what it's actually going into is a discretionary analysis. It says arrested multiple times. It's petitioner's allegation that the board somehow was equating those arrests to convictions, but the board never stated in its decision, didn't classify his previous arrests as actual convictions. And it didn't use that to come to the conclusion that he was a dangerous person? It relied on his second-degree eluding conviction and cited matter of gene in determining that his crime was violent in doing its discretionary analysis. It did also go into determining that Mr. Tejada had to establish the heightened hardship burden, but the board nevertheless held him to the lower threshold of to demonstrate extreme hardship in making its analysis. What about the IJ's credibility determinations, where it found that the daughter was credible and in fact, used the word compelling in her testimony about her relying on the father for financial and emotional support, and it seems that the BIA didn't give that very much weight at all. Yes, Your Honor. In this case, there was clearly a reversal, but there was no adverse credibility determination. The board on review of discretionary determinations can do that de novo. While the board, as Your Honors have pointed out, weighed the evidence differently, did not go into a lot of detail to the unfortunate assault that happened on the daughter, that's a weighing of the undisputed facts in the record in determining that Mr. Tejada did not establish extreme hardship, which is the first prong to eligibility for the 212H waiver. Is it the government's position that the board can reweigh the evidence completely, owes no deference to the IJ? Well, on discretionary review, it can do de novo review. If it was to dispute any of the factual findings made by the immigration judge, obviously factual findings are reviewed under the clearly erroneous standard. But here, as we discussed in our brief, there was no reverse note finding that Mr. Tejada was incredible. We didn't dispute any of the facts that occurred. Again, they were just weighed differently or didn't get as much discussion as petitioner would have liked. But that, again, goes to the weighing, and that is beyond this court's jurisdiction to review. It does not raise a viable constitutional claim or legal challenge. To what extent does this reweighing by the board impact, though, on the findings of the IJ? It seems that there's a line somewhere that you cross. It just changed the ultimate determination. Again, this is one of these cases where the board did not mischaracterize the record. Petitioner has not pointed out to any specific instance where there was a mischaracterization and that any evidence was ignored. It was all properly considered, and there is a presumption that petitioner must overcome that the board did consider all the evidence in the record. I can take a little issue with you because it seemed like the board was not impressed at all with the fact that the child was dependent on the father. Instead, the board said, well, he's been in jail for seven months, maybe, at least, in prison and then in custody. The board seemed to give that fact very little significance in terms of the IJ's finding that the child was dependent on the father. So it seemed like the IJ changed things around and came to its own separate weighing of the testimony. Well, again, the board is permitted under its de novo review of these discretionary determinations to weigh it differently. The board did, and I will agree with your honor, that there isn't as much elaboration in there as to the facts and the significance, so to speak, as to what happened to the daughter when she was a minor. The board does cite, of course, the correlating pages into the immigration judge's decision. It obviously did not write an exegesis on that particular topic. I don't disagree that the board took into account multiple arrests, to use the word. It used the word arrests, and that's an accurate recitation of the record in determining, as a matter of discretion, that petitioner did not merit the waiver. There was an arrest for simple assault and false imprisonment. Correct. And it's undisputed that those charges were dismissed, but nonetheless, you know, they are in the record. He was arrested on those two occasions, and he does have two convictions, a DUI and also the second-degree eluding offense, which, you know, the board, inciting matter of gene, appropriately found is a violent crime to be convicted under that, to which Mr. Tejada But then the board says that he, they were upset that he failed to take full responsibility for the harm that he caused. Correct. Well, he didn't really cause much harm. I mean, and all of this, when I look at the record, all that he was attempting to do was to differentiate what happened in his case from the Mendez Morales case of the BIA, and that dealt with statutory rape. Somebody who's intoxicated, who is not in a high-speed chase, but not stopping when instructed, and therefore is eluding police, that's a very different crime than statutory rape. Yes, Your Honor. The two are very distinct. And so in Mendez Morales, they said, well, the person really didn't take full responsibility. Understood. But here, all he was doing is saying, you know, this isn't as bad as what happened there. And the BIA completely misconstrues this out of, way out of context. Well, first, Your Honor, I want to point out that Petitioner has not challenged that at all in his brief. So in essence, he has waived any challenge to that finding by the board. In any event, in making this – Well, but the point that they did make is that there were findings that the board made that were different. Without finding that they were clearly erroneous, they just went in effect and made their own findings. And as I said, maybe it just rose to the level of sloppiness where they talk about several incarcerations and, in fact, there's really only one and a host of other things that you might consider small. But there's a flavor to what the BIA did here, and it seems like it went overboard in trying to find that this person wasn't deserving of a waiver, when, in fact, the example I just gave you is something where they overstated the case by a significant degree. Well, Your Honor, again, this is a purely discretionary determination. The Attorney General, by designation to the board, is permitted to make these discretionary determinations that are beyond this Court's review. On the same point, before you go into another point, when the board says, fail to take responsibility, is it going before a judge in the court and saying, yes, I committed the offense, I did it, I agree to the facts stated by the government? Isn't that taking responsibility for what you did? Well, I can't judge on that. I mean, that's the board's determination to make that. And under Mendez, whether or not the alien would take responsibility is a factor to be considered in the way. To go back to Judge Ambrose's point, it just seemed like the board was going overboard to deny a petition because he did, in fact, plead guilty in the court. And, of course, that requires an omission of facts underlying the offense. Correct, Your Honor. And in those facts, we know that he was intoxicated at the time, that he hit a vehicle which had somebody in it, and that he admitted to fleeing the police when they attempted to pull him over for this offense. In order to be convicted under this, you have to cause a risk of injury or death to another person. How fast was he going, do we know? I do not have that information. I mean, the impression that was given in the record that he was not going very fast. And, you know, the mistake that he made was that he pled guilty to second degree eluding when his counsel should have, you know, forced him not to do that. Well, Your Honor, his conviction remains binding for immigration purposes. He's not made any sort of Padilla v. Kentucky challenge to this conviction in the state court. So it is final. He pled to all the underlying offense, to the elements of this offense. He conceded during his hearing before the immigration judge that he was, in fact, intoxicated at the time. There's no doubt that he was intoxicated. I mean, over the limit. Correct. But intoxication in and of itself isn't a violent offense. He wasn't convicted of just having a DUI. That was his 2006 conviction. His 2007 for eluding, he had to cause a risk of injury or death to another individual. That's an element of the offense to which he pled guilty to. And, again, that conviction is final for immigration purposes. I'll also point out here that the immigration judge found that his conviction was a crime involving moral turpitude. That has never been challenged. So as we sit here today, there is no challenge that that second degree eluding offense is a crime involving moral turpitude. But we're dealing with it here today. Is the waiver correct? But I would point out as to the severity of it, that remained unchallenged. What makes this a crime of moral turpitude, eluding police? Well, again, Your Honor, that's unchallenged. No, no. I'm sorry. I'm asking you the merits. I can understand the argument because we have two NPOs, Lipscomb and Reyes. So we never have gone precedentially and said that it's a crime of violence. But what makes it a crime of moral turpitude, like fraud? No, I don't think it was the fraud. I mean, like a fraud. Fraud is a crime of moral turpitude, right? It is one. Among many. I actually believe that he conceded the charge of removing. No, no. But my point is, just wipe the slate, what makes eluding the police with regard to being intoxicated and causing a traffic accident when you elude the police, what makes that a crime of moral turpitude? Again, Your Honor, that would be a finding for the agency rather than me to make that determination. No, but you said it's a crime of moral turpitude. I'm saying it's unchallenged in this case. But what makes it a crime of moral turpitude? As found by the – I would have to, again, review the immigration judge's decision to review that analysis, which, again, was unchallenged. The IJ's decision, you mean? Well, it was – that's what his charge was. And in the immigration judge's decision – My point is this. I don't understand why that would be considered a crime of moral turpitude. And all I'm asking is tell me why. Because the alien at this time was feeling intoxicated. This was, again, the second offense of intoxication,  and he did, in fact, cause injury to another vehicle. It was like an auto accident, somebody who was drunk. Well, there's a little added aspect of it that he fled the scene. He didn't stop to see if the individual was okay. The police came to detain him, and he fled from them. So we have that added element, which would certainly rise it to the level of moral turpitude. But, again, here, that's uncontested. I'm just pointing that out that he never challenged that. Let me ask you something a little bit different. Let's assume that we find that there was an improper standard applied by the BIA and that, therefore, there's a legal issue here. It goes back to the BIA. What happens at that point? Well, Your Honor, again, the board would have de novo review, again, of the facts and the record. It's petitioner's burden here to allege legal claim as to both the extreme hardship analysis and as the matter of discretion analysis. And as the discussion here has shown, he's really challenging the weight and the characterization or the short recitation of facts that the board did in reaching its analysis as to both. You're saying that even though the immigration judge made a finding based on the facts and based on the testimony that the loss of the parent's financial and emotional support amounts to extreme hardship. And, of course, he took into account on the emotional support that the child had been subject to his sexual assault. Your argument is that the board can redo that analysis and on a plenary review come to a different conclusion. Correct. It just weighed those facts differently. Again, there's no minimizing what happened to the daughter here. The government does not want to give that impression in any respect, except here the board in its de novo review and it's entitled to weigh the factors different, put more weight on to the fact that his nature of his conviction and his other arrests in determining that he did not merit the waiver, one, as a matter of discretion, and two, for failure to establish the extreme hardship standard despite finding that his crime was violent or dangerous. Accordingly, we ask the government request this court dismiss the petition for lack of jurisdiction or in the alternative deny the petition for review. Any other questions? Ms. Heller, thank you very much. Thank you. Mr. Guzman. Your Honors, I just want to clear something up in terms of the actual arrest on page three of the sentencing. That's exactly what prosecutors do at sentencing. They like to magnify the whole history of a defendant before the sentencing court. I think that's exactly what the Bureau did. They wanted to factor all these arrests that Mr. Tejada had incurred in his life, but he only had that DWI conviction and then, of course, the eluding matter. The other aspect or notion is that this issue about remorse comes often and it comes more often in trial courts, especially during trial and at sentencing. I think that the record was not clear in the actual sentencing when Mr. Tejada was interrogated at his colloquy, however you want, his allocution. I think that because of a language issue, that's my interpretation as an officer of the court, that there was that issue or that haze of lacking remorse. But the fact is he pled guilty because he said on the roof that, I was guilty, I was intoxicated, and as a result, the trial judge, who was a sentencing judge, accepted his allocution. And so that's what we have here. Although that really wasn't in your brief, was it? It was not. It was not. Maybe it should have been as in preparation for today, but I'm just responding to issues with the Bureau itself. If this goes back, I trust it will. If it goes back, it just goes back before a new board and they have the opportunity to consider the decision by the circuit court here this morning in terms of how to handle these liberties that maybe that particular board took. It didn't take into account all the factors that the child is dependent on Tejada Tejada. In fact, at one point, the immigration judge took testimony that since Tejada Tejada is a native born from El Salvador, there's some issues happening in El Salvador. She just can't go see him and vice versa. He wouldn't be able to come see her. What about the – let's see if we can clear up. The eluding the police officer, as Heller said, is a crime of moral turpitude in addition to being a crime of violence, and the crime of moral turpitude portion was not objected to. What's your understanding? It's not a crime of moral turpitude, Judge. The fact is that he was intoxicated. He admitted that he was intoxicated. Is there any case that we have that deals with whether eluding a police officer is a crime of moral turpitude? I don't. In preparation for this argument, I don't have one handy, and I did not come across one. In terms of it being – the eluding being in this situation defined as moral turpitude, I think the record, again, was not as hazy. I think that part of the transcript for sentencing, he makes a reference that he actually came across the motorist. He sped off, but then he returned back. When he returned back, that's what happened. He encountered a police officer that evening or that morning in question, and as a result from that situation, less than the legal limit of 30 or 25 or 30 miles per hour in Ocean County, that's when the eluding takes place. So when the court focuses on whether or not this was a true eluding or not eluding under the circumstances or differences of eluding, it is. And the sentence was for seven months? No, the sentence was for three years. And he served seven months. Oh, and I'm glad that you raised it, Jotrantis. The sentence was for three years. He then makes an application in New Jersey for what they call the intensive supervised probation program. That's not an easy thing to get into, number one. It takes like six months just to make the application and to actually get a consultant number. That's what they call them. And then comply with all these strict requirements. I mean, you have to be in by 6 p.m. They check you routinely at the phone. They come to your door at 2 o'clock in the morning. It's very intense. It's not an easy thing, and he actually complied with it. That's why he was able to serve the balance of his term outside in this program, and he was able to take care of his responsibilities, the mortgage, okay, the child in question, trying to regain back his employment. The guy was employed for 20 years, so, I mean, he did a lot. And it would be a disservice if the waiver is not granted in his favor. And so my time is up. I thank you for your time. I'm grateful for the court, and I ask that you take it to advisement and that you rule it in his favor on the petition. Thank you. Thank you, Mr. Guzman. And we thank both counsel for a very helpful argument. We'll take the matter under advisement.